(25 App. Div. 339.)

PEOPLE ex rel. SPIRE v. GENERAL COMMITTEE OF REPUBLICAN PARTY OF ERIE COUNTY.

(Supreme Court, Appellate Division, Fourth Department.  February 6, 1898.)

1. APPEAL—DISMISSAL—QUESTIONS OF PUBLIC INTEREST.

Where the question involved in a case is of public interest affecting all the electors in the state, the appeal will not be dismissed, though the question is no longer a practical one.

2. ENROLLMENT OF PARTY VOTERS—RIGHT TO INSPECT AND COPY.

Where an enrollment of the registered Republican voters in a city, made for the benefit of the party, is open to inspection by any member of that party, the right to inspect includes the right to make a copy of the list of names found there, provided such member, in copying, does not take up unnecessary time, or interfere with the right of inspection by any other member.

Adams and Ward, JJ., dissenting.

Appeal from special term, Erie county.

Application for mandamus by the people, on the relation of Leonard S. Spire, against the general committee of the Republican party, known as the Republican Organization of Erie County.  From an order denying the writ, relator appeals.  Reversed.

The defendant is the political organization in the county of Erie of one of the two principal parties of this state, and as such it has duly adopted certain rules and by-laws for its government, and presumably for the furtherance of the principles of the political party which it represents.  During the summer of 1897 the defendant, in pursuance of such rules, had caused to be made enrollment books containing the names of all the members of the party who had been registered and who were entitled to vote at the primaries to be soon thereafter held in the city of Buffalo.  These books contained the names of about 34,000 electors, and, when completed, they were placed in the custody of the defendant's officers at the local headquarters of the party.  One of the defendant's rules provided that "these books shall at all times be open to the inspection of any Republican."  On or about the 11th day of September, 1897, the relator, who was a Republican elector, in company with two other Republican electors, called at the defendant's headquarters, and asked for permission to inspect the enrollment books, and especially those relating to the Fifth and Sixth districts of the Twenty-Fourth ward.  In compliance with such request, the books were handed to the relator and his associates by the defendant's secretary, and an opportunity was afforded them to inspect the same.  Availing themselves of this opportunity, the relator and his associates undertook to make a transcript of the names appearing upon the books which they were inspecting, and, after having the same in their possession for this purpose for the period of an hour and a half, the defendant's secretary demanded the books, and refused to allow any further inspection thereof for the purpose of making such transcript.  The relator thereupon applied for a peremptory writ of mandamus, and from the order denying such application this appeal is brought.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

Simon Fleischmann, for appellant.

Tracy C. Becker, for respondent.

HARDIN, P. J. This court held in Re Cuddeback, 3 App. Div. 103, 39 N. Y. Supp. 388, viz.:

"An appeal will not always be dismissed because the question is no longer a practical one. Notwithstanding the fact that an election has been held, and a decision of the question involved cannot affect the result of that election, yet, where the point at issue is one of public interest, affecting the rights of all the electors of the state, the courts will determine it."

Following the doctrine there laid down, it seems that we ought not, in this case, to dismiss the appeal, because the question here involved is as much a matter of public interest as the question involved in the case from which the quotation has been made. The enrollment was made for the benefit of the Republican party. The relator was a member of that party, and sought the information which the enrollment would afford him. While he was consulting the books, and gathering from them the information which he, as a member of the Republican party, was entitled to, he was interrupted, and prevented from the completion of his efforts. He, in effect, was denied the full privileges of "an inspection." Cotheal v. Brouwer, 5 N. Y. 562. The denial was not put upon the ground that he was taking unnecessary time, or interfering with the rights of any other member of the party to examine the books, but upon the assertion that he had no right, while inspecting to make a copy of the list of names he found on the enrollment. Such denial seems to have interfered with the rights and privileges of a member of the party in whose interest the enrollment was made. Mutter v. Railway Co., 59 Law T. (N. S.) 117, 38 Ch. Div. 92. In that case Lord Justice Lindley, in delivering judgment, said that an examination of the authorities had led him to the conclusion that, speaking generally, a right to take copies is always treated as incidental to a right to inspect. "When the right to inspect and take a copy is not expressly conferred, the extent of such right depends on the interest which the applicant has in what he wants to copy, and on what is reasonably necessary for the protection of such interest." See, also, Nelson v. Agency Co., 75 Law T. (N. S.) 482, cited in 31 Am. Law Rev. 916, 917. The special term might, therefore, have properly awarded a mandamus requiring the defendant to allow the relator a further examination and inspection of the enrollment. These views would seem to lead to the conclusion that the special term improperly denied the writ, and that its order should be reversed.

Order reversed, with costs.

FOLLETT and GREEN, JJ., concur.

ADAMS, J. (dissenting). The sole reason given by the relator for desiring to inspect and transcribe the defendant's enrollment books

is that the party primaries were called for the 28th day of September, and he wished an opportunity to determine whether all the electors were enrolled who were entitled to vote at such primaries, and also whether there had been any fraudulent enrollment of names upon the books. The time for holding these primaries having long since passed, it is manifest that no practical result can follow a determination of the question which the relator desires to have reviewed, and for that reason the appeal ought, perhaps, to be dismissed. People v. Grace (Sup.) 1 N. Y. Supp. 661; In re Woodworth, 64 Hun, 522, 19 N. Y. Supp. 525; Reynolds v. Everett, 67 Hun, 294, 22 N. Y. Supp. 306; In re Madden, 148 N. Y. 136, 42 N. E. 534. But, inasmuch as the question is thought by a majority of my brethren to possess some public interest, and therefore to call for a determination within the rule adopted by this court in Re Cuddeback, 3 App. Div. 103, 39 N. Y. Supp. 388. I will state briefly my reasons for dissenting from the prevailing opinion.

The relator's application for a peremptory mandamus was founded upon his own affidavit, in which he stated that, after he and his associates had been engaged in the inspection of the defendant's enrollment books, and in transcribing the names therefrom, for the space of an hour and a half, the defendant's secretary stated to them that he would not permit any further inspection for any purpose. This was met by a counter affidavit, made by George D. Emerson, the defendant's secretary, in which he denied that he refused to allow the relator a further inspection of the books, and averred that he only refused to permit him to transcribe or copy the contents thereof. By persisting in his application for a peremptory writ after having been advised of the defendant's contention, the relator admitted the truth of every statement contained in the opposing affidavit (People v. New York Law School, 68 Hun, 118, 22 N. Y. Supp. 663), and consequently we are confined to such statements in our examination of the question under consideration. This being the case, the most that can be claimed in support of the relator's contention is that he was not permitted to retain the custody of the defendant's enrollment books for the purpose of transcribing the same; and it is to be observed that this claim is not accompanied by any charge of bad faith. These books, which were designed ostensibly to furnish satisfactory proof of the qualification of electors who might desire to vote at the party primaries which were about to be held, were doubtless, in a certain sense, the property of the party; that is, every person calling himself a Republican had an undoubted right, under the rules of the organization to a reasonable inspection of them at all times; but, nevertheless, the books were placed in the custody of the officers of the organization, and those officers, as such custodians, were thereby invested with some discretionary power as regards the use to which the books should be put, as well as with some responsibility for their safekeeping. Had the relator been denied a reasonable opportunity to inspect the books, that would unquestionably have been such a violation of one of the defendant's rules as would have justified interference by the courts; or were there any evidence that the defend-

ant had acted in bad faith, or from any improper motive in refusing to allow the relator to transcribe the contents of the books, the remedy invoked in this proceeding might be applicable; but it seems that there were 155 of these books, and that it took three persons an hour and a half to transcribe the names from one or two of them. It is quite apparent, therefore, that if the relator had been permitted to insist upon retaining their custody until all the names had been copied, he would possibly have prevented other parties equally interested from any inspection of them whatever. In these circumstances I do not see how it can be said, even upon the assumption that the right of inspection, generally speaking, involves the right to make copies, that the defendant's refusal was an improper exercise of the discretionary power with which its officers were invested, or that, unaccompanied by any charge of bad faith, it affords sufficient ground for granting the relief asked for. People v. Commissioners of Land Office, 149 N. Y. 26, 43 N. E. 418.

The order appealed from should therefore, in my opinion, be affirmed.

WARD, J. (dissenting). The general committee of the Republican party of Erie county, called the "Republican Organization," is a voluntary organization, created for party purposes, without judicial functions or powers, and not created by any statute, and there is no express authority given by the statute for the courts to interfere with its proceedings or determinations. The learned counsel for the appellant cites sections 52 and 53 of the Election Code (chapter 909, Laws 1896), providing that political primaries shall be presided over and selected in the manner prescribed by the rules of the political party holding such primary, and that no person shall be qualified to vote at such primary unless he shall possess such other qualifications as shall be authorized by the regulations and usages of the political party holding the same. Making a list or enrollment of the members of a political party for the purpose of preparing for its primaries, and the mode of doing so, is neither prescribed nor condemned by statute, and I entertain great doubt whether the courts can supervise the action of these voluntary political committees in regard to the enrollment of its voters; but this point is not raised in the briefs presented upon this appeal, and I will consider the question as though the courts had the power claimed in the premises.

The respondent had adopted certain rules for the enrollment of the Republican voters of the county of Erie. The rules are broad and liberal, and full opportunity is given for the enrollment of every voter in the party. On or before the 1st day of June in each year an enroll man is selected by the committee in each district for making an enrollment of the Republican voters therein. The names of these enroll men are published in the Republican daily papers in the city of Buffalo, with a notice of the street and number at which an enrollment will be made of the Republican voters of the district, and the rules are published for the enrollment for primary meetings, and require that "each enroll man in each district

shall forthwith make an enrollment of the Republican voters of the district in duplicate upon two different books by placing thereon the names and street address of all Republican voters residing in the district, so far as the same are known to him, or upon information received from any known Republican, either in person or by written communication." The enroll man shall, on June 15th, deliver one of the books to the secretary of the committee, and the other book to remain in the hands of the enroll man until the 1st day of July following. "During the interim from June 15th to July 1st names of Republican voters not enrolled may be added to the list upon either enrollment book on the personal application only of the voter entitled to be so enrolled, to the secretary at the headquarters of the general committee or to the enroll man in charge of the enrollment book of the district, or at the place designated in the public notice given by the secretary." On the 1st of July the enroll man delivers his book to the secretary, and the secretary shall then proceed to have placed upon each of the books all the names which appear upon the other, so that the two books will correspond. They are signed by the secretary, and "the books shall then remain in his [the secretary's] custody until the day previous to holding the primaries, when they shall be delivered to the several enroll men in whose hands they were originally placed, and they shall have them at the places of holding the primaries, for the use of the officers of such primary. The day following each primary meeting, each enroll man shall deliver back to said secretary both of said enrollment books. These books shall at all times be open to the inspection of any Republican." After the 1st day of July, and until and including the sixth day preceding the primary meeting, any Republican not enrolled can be enrolled upon taking certain proceedings before the committee. The caucuses are usually held in September or October, so that ample time is afforded previous to the primaries, under the rules of the committee, to enroll every Republican voter in the county of Erie. The record does not disclose any complaint against the committee of unfairness, fraud, or any partiality for candidates, cliques, or factions in the Republican party. We must assume for this purpose that the committee fully and fairly represented the whole party in its work of enrollment and preparation for the primaries. The relator, on the 11th of September, 1897, together with two other Republicans, called at the headquarters of the committee, and asked the secretary for the enrollment books of the Fifth and Sixth districts of the Twenty-Fourth ward, for inspection. The secretary handed the books to these gentlemen, and they not only inspected the books, but transcribed names therefrom for about an hour and a half, when the secretary, concluding that they had had time enough to make such inspection, resumed the possession of the books. The primaries were to be September 28, 1897, and the relator and his friends had two weeks, under the rules, to inspect the lists at proper times consistent with the rights of other voters, and place any missing names upon the list. As shown in the opinion of Judge ADAMS, the opposing affidavit of Mr. Emerson, the secretary, must be taken as true in this

proceeding.     That affidavit, verified the 15th of September, 1897,
states:

"The primary meetings of the Republican party will be called and held within
the county of Erie not later than October 8th next for the purpose of nomi-
nating candidates to be voted for at the next ensuing election, and the said
enrollment books are very much in use by the said committee and the Re-
publican voters, and frequent references have to be made to them, and they are
almost constantly in use at this time, and there are one hundred and fifty-five
of said enrollment books, and in the neighborhood of thirty-four thousand names
thereon, and that to permit the said relator and others at this time to have
the custody thereof for the purpose of transcribing the same would lead to great
confusion and embarrassment, and would greatly delay and hinder the work of
the said committee and of this deponent in the proper discharge of the duties
devolving upon them under the rules of the said Republican party."

The affidavit further attacks the good faith of the relator and
his friends, and, in effect, denies that they wanted such inspection
for the purpose of determining whether all the Republican electors
entitled to be were enrolled, and whether there was any fraudulent en-
rollment of names upon the books, but that they desired to procure
such names in the interest of candidates for office.  It is apparent
that if these three gentlemen could use the enrollment books in-
definitely, or such a length of time as they might desire to tran-
scribe the names, the same privilege would belong to each and every
of the 34,000 Republican voters in Erie county, and, if this privilege
was accorded to all who might apply, the committee would be
unable to discharge its duty properly; and it must follow that a
discretion rests in the committee having charge of these books as to
the extent to which they are to be used by any one or more of the
individual voters.

The appellant's counsel lays much stress upon the fact that the
secretary refused to permit the transcribing of the names from the
book after the hour and a half's inspection, and the claim is that
inspection means the right to copy the names from the book; and
cites Cotheal v. Brouwer, 5 N. Y. 562, as sustaining this contention.
I do not understand that the word "inspection" covers the right to
copy from or take away any portion of the thing inspected.  "In-
spection" is derived from a Latin word, "inspicere,"—to look into.
1 Bouv. Dict. 725.  Webster defines "inspect" to mean "to look on;
to view or oversee for the purpose of examination; to look into;
to view and examine for the purpose of ascertaining the quality or
condition of a thing; to view and examine for the purpose of dis-
covering and correcting errors, as to inspect the press or proof
sheets of a book."  The same definitions are given in the Imperial
Dictionary.  The Code of Civil Procedure and our rules of practice
recognize the distinction between inspection and taking of a copy.

Section 803 of the Code provides for an inspection and copy or
permission to take a copy.  Rule 14 of the general rules of practice
provides that application may be made in the manner provided by
law to compel the production and discovery or inspection with copy
of books, etc.   The case of Cotheal v. Brouwer, supra, does not sus-
tain the appellant's contention.  In that case the plaintiff was a
stockholder in a private corporation.  The statute provided that the

books of the corporation should be open to examination to every stockholder for 30 days. The officer in charge of the books refused to permit the plaintiff to take a copy or memorandum of the names of the stockholders. It was held that this stockholder was entitled to make this memorandum. The trial judge charged that the stockholder had a right, not only to inspect the books, but to take copies of the names. The distinction between the simple right of inspection and the right to take copies and memorandums was observed through the case, but, this being a business corporation, in which the stockholder had a pecuniary interest in knowing who the other stockholders were, it was held that under the word "examination" the plaintiff had the right contended for. The Republican committee of Erie county is not a corporation, nor in any sense directed by statute what privileges it shall accord to the voters as to the examination of its books. It has made simply a regulation that the voters may inspect the books, but has not made a regulation that any voter, or any number of voters, can deprive the committee of the use of their books for such a length of time as the voters may choose for the purpose of copying the contents of the books.

I think the court at special term, in its discretion, upon the record here presented, made a proper disposition of the motion before it, and the order appealed from should be affirmed, with $10 costs and disbursements.