· (15 Misc. Rep. 333.)

PEOPLE ex rel. LEERBURGER v. MUTUAL RESERVE FUND LIFE ASS'N.

(Supreme Court, Special Term, New York County.    December, 1895.)

MUTUAL BENEFIT INSURANCE—FORFEITURE OF MEMBERSHIP—WAIVER.

A mutual benefit association, certificates of membership in which were issued subject to the condition that they should be void in case payments were not made on or before the day fixed therefor, sent to one H., who was designated by a member, under the rules of the association, to receive notices, a printed notice, on April 1, 1895, that such member's annual dues would be due on May 29th following, and called attention to the necessity of payment in order to avoid forfeiture.    H. had been accustomed to pay dues and assessments for the member as they matured, but he neglected to pay the dues for May 29, 1895.    On June 4th the secretary of the association wrote the member, asking whether his dues had been paid, and stating that if they had not his membership was forfeited, and could be reinstated only on application to the executive committee.    On the receipt of the letter, H. sent to the association his check for the amount of dues.    The check was received, and deposited in bank by the association.    On June 1st a mortuary call was made on the member, the notice of which stated that it should not be held to waive any forfeiture caused by nonpayment of any previous sum.    On June 14th the secretary of the association wrote the member that his certificate had lapsed, and could only be reinstated on application.    On June 21st he again wrote, referring to the previous letter, and inclosing a blank form of application for reinstatement.    The member refused to sign the application because of the recital that his membership had expired.    During all this time the dues which had been paid after the forfeiture were held by the association subject to the order of the member in case he did not apply for reinstatement.    Held, that the forfeiture of membership was not waived by the association.

Application by Simon Leerburger for a peremptory writ of mandamus to compel the Mutual Reserve Fund Life Association to reinstate relator as a member of said association.    Denied.

Samuel H. Guggenheimer (Otto Horwitz, of counsel), for relator.
George Burnham, Jr. (W. T. B. Milliken, of counsel), for respondent.

BEEKMAN, J.    The respondent is a membership corporation, carrying on a business of life insurance upon the co-operative or

assessment plan, and the relator was and claims still to be a member of the same. The respective rights and duties of the members and the corporation are found in the constitution or by-laws of the association, the application for membership, and the certificate of membership or policy of insurance issued by the respondent to its members. The constitution or by-laws are adopted by the members, and are subject to change by them at meetings provided for in the constitution. At such meetings they also elect the board of directors. They thus, in the first instance, exercise full legislative powers in the direction of the affairs of the corporation. On the 1st day of June, 1883, the relator was duly admitted to membership, and a written certificate of such membership was duly issued to him. On or about the 22d day of June, 1885, this certificate was surrendered, and another one issued in its place, and this was repeated from time to time until on or about January 12, 1891, when the last certificate, and the one under which the relator now asserts his claim, was duly issued to him. By such certificate it was, among other things, provided that the Mutual Reserve Fund Life Association received Simon Leerburger as a member of the association, and upon the condition of the payment by him of the dues for expenses, to be paid on or before the 29th day of May of every year during the continuance of his membership, and also upon the further condition of the payment of all mortuary premiums within 30 days from the first week day of the months of February, April, June, August, October, and December of each and every year, there should be payable to Siegmund Harris (creditor), as his interest may appear, one-half, and to Albert Harris (creditor), as his interest may appear, one-half, if living at the time of the death of said member, otherwise to the legal representatives of said beneficiaries, the sum of $5,000, within 90 days after acceptance of satisfactory evidence to said association of the death of said member. It was also provided that no personal liability was incurred by the member in respect to any of such payments, and that the continuance of the certificate, or "policy of insurance," as it is sometimes called, and all payments by the members holding the same, are voluntary, at the option of the member, to continue only so long as he may desire to keep the certificate or policy in force, but that a failure to make such payments will terminate the contract; and the contract is, in express terms, defined to be a bimonthly term contract, renewable at the option of the member, before expiration, upon payment of the dues and mortuary premiums at the times and in the manner therein provided. It is also further specified that the certificate or policy of insurance is issued and accepted subject to the express condition that if any of the payments stipulated in said contracts shall not be paid on or before the day of the date as therein provided, then the consideration thereof shall be deemed to have failed, and the certificate or policy shall be null and void, and all payments made thereon shall be forfeited to the association. The constitution provides, among other things, that if any of the conditions or provisions

of the certificate of membership or constitution or by-laws are violated by a member, then, and in every such case, such membership shall at once cease and determine, and the certificate shall be null and void, and all payments made thereon forfeited to the association.

In the case at bar the amount of the annual dues to be paid by the relator as a condition of the continuance of his membership and insurance was fixed at the sum of $10, and should have been paid by him on or before the 29th day of May, 1895. This, however, he failed to do, for reasons which will be hereafter stated, and, the respondent refusing to recognize him any longer as a member, he now applies to this court for a peremptory writ of mandamus, in the first instance, to compel the respondent to restore him to his rights of membership, upon the claim that there has been a waiver by it of the forfeiture. The attorney for the respondent read upon the hearing affidavits which, to some extent at least, put in issue some of the facts set forth in the moving papers; and as the relator, notwithstanding, proceeded to argue his case in support of his application for a peremptory writ, all of the facts which are contained in the answering papers of the respondent must be taken as true. People v. New York Law School, 68 Hun, 118, 22 N. Y. Supp. 663, and cases there cited. It appears that, in accordance with the custom of the respondent, a printed notice was sent by it to the relator on or about the 1st day of April last, informing him that the annual dues on his policy, amounting to $10, were payable on the 29th day of May, 1895, "without grace," at the office of the association. The circular also contained these statements:

"Prompt remittance is requisite in order that your protection may be continued. The dues stated above should not be confounded with the mortuary payments. The payment of the one is equally as important as the payment of the other. If the same is not paid within the time stated, the policy and all the payments thereon will become forfeited and void, and your membership with the association will expire, with all rights thereunder. The sending of this notice or acceptance of above dues shall not be held to waive any forfeiture or expiry caused by nonpayment of any previous sum, when due, under said certificate or policy."

And immediately following the subscription of the circular by the secretary of the association appears in heavily printed capitals the following:

"The above amount must be paid on or before May 29th, 1895."

It will thus be seen that the relator had substantially two months' previous notice of the maturity of his annual dues, accompanied by statements from the respondent pointedly calling his attention to the necessity of paying the same on the day specified, in order to avoid a forfeiture of his membership and policy. Under the rules and regulations of the association, members were authorized to designate persons to whom all notices or other communications intended for them might be addressed, and for that purpose the relator designated one Siegmund Harris, who was his son-in-law. The circular above referred to was accordingly forwarded to Mr.

Harris, and was received by him, and it had been his practice to take charge of such matters, and to pay for the relator the annual dues and mortuary calls as the same matured. He neglected this, however, in the case of the dues which were payable on the 29th day of May, 1895. The explanation given by him for his default is that he had just moved his business, and was so engrossed in superintending the removal and arrangement of his new stock that the matter slipped his mind until the 6th day of June. Upon this state of facts it is perfectly plain that the policy was forfeited, and the membership of the relator had come to an end. The continuance of the contract between the parties was in express terms conditional upon the exact and timely performance by the relator of the obligations assumed by him, and his failure to perform them necessarily resulted in a complete termination of any further obligation on the part of the company to him. But the relator claims that, by reason of what took place subsequently between himself and the company, the forfeiture was waived, and he was completely restored to his status and rights as a member and under his certificate or policy of insurance. Whether there was such a waiver or not depends upon the legal effect of the following facts:

On the 4th day of June, 1895, a letter was addressed by the secretary of the company to the relator, requesting him to state whether or not his annual dues, payable on May 29, 1895, had been paid. The letter also contained the following statements:

"If you have paid or remitted the above, please state actual date of so doing, whether by check or otherwise, and to whom; and, if you have a receipt for such payment, the name of the person signing or countersigning same, together with date of the receipt. Our books show that the above annual dues remain unpaid, and that your policy has expired. Remittances are frequently received without advice as to the name of the member remitting the same or number of the policy to which credit should be given; hence the correct credit cannot be given the member making the payment. If through an oversight or misunderstanding the above has not been paid, and you desire to reinstate your policy, you may be reinstated upon furnishing the association with a satisfactory application for reinstatement and warranty of health, and under the conditions thereof, and subject to the approval of the executive committee, and payment of amount of your dues as above. The signature of a member to the application for reinstatement must be certified to by some responsible person. In any case, when deemed necessary, a medical examination will be required."

By this communication the respondent clearly pointed out to the relator the fact that his membership and insurance had both come to an end by his own act, and that the only remedy was an appeal, upon conditions named, to the executive committee, under a by-law of the association, which provides that:

"The executive committee shall have power to reinstate a delinquent member at any time within one year, for good cause shown, and upon satisfactory evidence of good health, and upon payment of all delinquent dues and assessments."

Upon the receipt of this letter, and on the 6th day of June, 1895, Mr. Harris forwarded to the respondent his check for the sum of $10, inclosing therewith the letter which he had so received. This check was duly received, and was deposited by the

respondent on the 7th day of June, 1895, the indorsement reading, "For deposit with the National Park Bank to the credit of the Mutual Reserve Fund Life Association, mortuary account." It appears also that on the 1st day of June, 1895, a mortuary call was made upon the relator amounting to $31.95, to be paid within 30 days from said date; and printed upon it was this statement:

"The sending of this notice or acceptance of above premium shall not be held to waive any forfeiture caused by nonpayment of any previous sum when due under said certificate or policy."

In the transaction of an enormous business such as is conducted by the respondent, it must often be the case that such calls are made inadvertently upon members whose policies and memberships have recently expired. Such a caution is, therefore, both prudent and reasonable, in order to avoid a claim that the call was a recognition of a continuance of membership and a waiver of the forfeiture. The relator claims that this call was received by Harris on or about June 3, 1895, and that Mr. Harris, knowing nothing at that time of any infirmity in respect to the policy of membership, mailed to the respondent a check for the amount of the call in question, which check was received by the company on June 13, 1895, and indorsed for deposit with the Merchants' Exchange National Bank "to the credit of the Mutual Reserve Fund Life Association, dues account." During all this time, notwithstanding the plain notice conveyed by the company to the relator in the letter of June 4th that his policy and membership had expired, and that his only hope of reinstatement was to make application therefor to the executive committee, and to comply with the other conditions, which were specified, no steps of any kind were taken by him to that end. It does appear, however, from the relator's papers, that on or about June 11, 1895, his attorney, claiming then to be acting only for the beneficiaries under the policy of insurance, visited the office of the company, and requested the reissuance of the policy to a new beneficiary, and that he was thereupon informed that such change could not be made immediately, as the condition of the policy was doubtful, by reason of the failure to pay the annual dues. The answering affidavits of the respondent—which, as has been stated, must be taken to be true for the purposes of this motion—give the following version of this interview, viz.: That on the 10th day of June some one called at the office of the company on behalf of the relator, and was then informed that the policy had lapsed; and that, if the relator desired to continue his insurance with the association, it would be necessary to make application for reinstatement, and to enter into a new contract, and to conform to the terms and conditions prescribed by the constitution, by-laws, rules, and regulations of the association; and that he was furnished with the proper blank therefor, which blank was brought by him to the company on the 12th day of June, filled out and signed, but which the person so bringing refused to leave for the consideration of the executive committee. In answer to the claim that there had been an unconditional acceptance of the checks

which had been sent to the company on behalf of the relator, in payment of the annual dues and the mortuary call, it is stated on behalf of the respondent that:

"It is the custom of said association, when payments of dues or mortuary calls are tendered upon lapsed policies, to give the delinquent member an opportunity to apply for reinstatement, and to retain the money so tendered with the consent of the delinquent member, subject to his order, as they did in the case of said relator, awaiting his election to recall such money, or to make application for reinstatement upon the conditions prescribed by the rules and regulations of said respondent association as aforesaid."

In this connection it will be remembered that the notices sent to the relator contained the statement that the acceptance of the money payable by him should not be held to be a waiver of any previous default which had been incurred by him. The papers read on behalf of the respondent also show that among the books of account kept by it have been two in which are accounts entitled "Suspense Account," in one of which are entered the respective amounts tendered by delinquent members for overdue annual dues, and in the other the amounts tendered by such members for overdue mortuary assessments, all of which are credited to said delinquent members, and held subject to their order. On June 7, 1895, the check received on that day by the company for the annual dues of the relator was entered in the suspense dues account to the credit of his policy, and on the 13th day of June, the date on which the same was received by the respondent, the check which was forwarded on behalf of the relator for the mortuary call was entered in the suspense mortuary assessment account to the credit of said policy. On the 14th day of June the secretary of the respondent addressed a letter to the relator, in which it was stated that the remittance of $10 tendered in payment of the annual dues was received on June 7th, and placed in the suspense account, subject to his order, by reason of the lapse of the policy on May 29th. In this letter the relator is also informed that his representative called at the office on June 10th, and had been furnished with a blank form of application for reinstatement; that he returned on June 12th, with the application filled out and signed, presumably by the relator, but refused to leave the same for the consideration of the executive committee. The letter closes with the following statement:

"I call your attention to the matter, in the hope that you will furnish an application for reinstatement upon the form herein inclosed, and return it promptly to this office. It will then be submitted to the executive committee for their action. If approved by them, your policy will be thus reinstated, and a receipt in accordance with the rules of the association sent to you. In the meantime your policy remains lapsed, null, and void."

It is claimed by the relator that he first had personal knowledge of the condition of his policy and membership on the day on which this letter bears date. On the 21st day of June, 1895, the secretary of the company again wrote to the relator, calling his attention to his previous letter, and stating that he had not been favored with a reply, adding that he had also found that on June 13th the relator had

remitted to the office $31.95, tendered in payment of mortuary call No. 80, which remittance had been placed in the suspense account, subject to relator's order, by reason of the lapse of his policy.   He again advises the relator as to the course which he should pursue, in the following words:

"I inclose to you herewith a blank form of application for reinstatement, requesting that you will kindly fill out the blank spaces thereon, date, sign the same, have your signature witnessed, and return it to this office. It will then be submitted to the executive committee for their action. If approved, and all moneys due have then been received, your policy will be thus reinstated, and a receipt in accordance with the rules of the association sent to you. As the policy now stands lapsed, null, and void, let me request your prompt attention and reply."

By the rules and regulations of the respondent, delinquent members desiring reinstatement are required to sign a certain form of application, containing certain statements in regard to the physical condition of the applicant, and other matters pertinent to the desirability of the risk.   The relator, both personally and through his counsel, was notified that such a signed application was essential, in order to bring the question of his reinstatement properly before the executive committee, and that the question of his reinstatement would not be considered unless the rule in that respect was complied with.   It is true that he underwent a medical examination, which is also required in addition to the making of such application, but he still persisted in refusing to sign the application.   The refusal of the relator to sign was based upon a recital which the form of application for reinstatement contained, setting forth his failure to pay the annual dues, and that by reason thereof his membership and policy had expired.   This recital forms part of the printed form used by the company in all cases where application for a reinstatement is made. The ground of his refusal was his unwillingness to admit that his policy and membership had expired, and, while he was willing to undergo a medical examination, and to submit other information to the executive committee in respect to his condition, he persistently declined to place himself in the position of asking for reinstatement. The company, on the other hand, as persistently refused to consider him in any other light than as a delinquent member whose rights had been forfeited, and insisted that if he desired reinstatement he must conform to the rules and regulations of the company in making his application.   In this respect I think the respondent was right.   It is plain that the company was not bound to entertain an application for reinstatement—a purely voluntary proceeding on the part of the delinquent member—when it was accompanied with the assertion that no reinstatement was necessary, as the membership and rights of the relator were unimpaired.   The case is not one in which the company, for any purpose of its own, was seeking action on the part of the relator.   The proceeding was intended solely for the benefit of delinquent members, and was entirely inappropriate and inapplicable to any other condition than one of existing and conceded forfeiture. Finding that the relator was unwilling to recede from the position which he had taken, the secretary of the company, on July 10, 1895,

transmitted to him the company's checks for $10 and $31.95, the sums which had been received and placed to the credit of his policy in the suspense accounts, subject to his order, as above stated, inclosing the same in a letter, in which it was stated that, as the relator had declined to apply for reinstatement, there was nothing due the association. The relator thereupon returned the checks, and subsequently commenced this proceeding.

It is plain that there is but one question presented for decision upon the above statement of facts: Did the respondent at any time waive the forfeiture of membership and policy which undoubtedly happened when the relator failed to pay his annual dues which matured on the 29th day of May? There is no difficulty in determining the law as to what constitutes a waiver of a breach of condition or forfeiture. In the case of Titus v. Insurance Co., 81 N. Y. 410, it is stated (page 419):

"When there has been a breach of a condition contained in an insurance policy, the insurance company may or may not take advantage of such breach, and claim a forfeiture. It may, consulting its own interests, choose to waive the forfeiture, and this it may do by express language to that effect, or by acts from which an intention to waive may be inferred, or from which a waiver follows as a legal result. A waiver cannot be inferred from its mere silence. It is not obliged to do or say anything to make the forfeiture effectual. It may wait until claim is made under the policy, and then, in denial thereof, or in defense of a suit commenced therefor, allege the forfeiture. But it may be asserted broadly that if, in any negotiations or transactions with the insured, after knowledge of the forfeiture, it recognizes the continued validity of the policy, or does acts based thereon, or requires the insured by virtue thereof to do some act or incur some trouble or expense, the forfeiture is, as matter of law, waived; and it is now settled in this court, after some difference of opinion, that such a waiver need not be based upon any new agreement or an estoppel."

The same question was discussed in the case of Armstrong v. Insurance Co., 130 N. Y. 560, 29 N. E. 991, in which many of the cases upon this subject are considered. In Ronald v. Association, 132 N. Y. 378, 30 N. E. 739, the court says (page 383, 132 N. Y., and page 739, 30 N. E.):

"A waiver of the forfeiture of a policy, in the absence of any agreement to that effect, results from negotiations or transactions with the insured, after knowledge of the forfeiture, by which the insurer recognizes the continued validity of the policy, or does acts based thereon, or requires the insured, by virtue thereof, to do some act or incur some expense or trouble. Titus v. Insurance Co., 81 N. Y. 419. In the absence of an 'estoppel, knowledge of the facts and an intention to waive must exist; provable, of course, by the circumstances."

There must, therefore, be found in this case satisfactory evidence of an intention on the part of the respondent to waive the forfeiture in order to justify the position assumed by the relator. Of course, this must be largely, if not exclusively, a matter of inference from the acts of the respondent. Mere statements as to what the intention was or was not cannot prevail against the necessary or natural conclusion flowing from its acts. If those acts are consistent only with the theory that the company did not intend to stand upon the forfeiture, it is clear that there has been a waiver, and mere statements that no intention to waive existed will not be allowed to control.

The test, then, which must be adopted in the solution of the question now before us is:   Were any of the acts of the respondent, after the forfeiture of the policy had taken place, so inconsistent with the continued existence of the forfeiture as to express in themselves an intention to waive the default, and to recognize the relator as a member of the association in good standing?   I fail to find any such evidence. It will be remembered that the check which was forwarded to the company for the annual dues was transmitted by Mr. Harris, on behalf of the relator, with the communication from the company which had been sent to him, and which advised the relator that his dues remained unpaid, and that his policy had expired.   The same letter also stated that, if he desired to reinstate his policy, it might be done in the manner pointed out on payment of the amount of the dues.   If the case had been one in which there had been an unqualified acceptance of the dues, there would, of course, have been no doubt as to the waiver of the forfeiture.   The dues are not debts of members.   As has been said, it is entirely at their election whether they will pay them or not, and the only effect of a failure to pay is the immediate termination of membership and insurance.   A general and unqualified acceptance of such dues, therefore, could not possibly be consistent with any other position than that of a waiver of any forfeiture which might have taken place.   In the present case, however, we find running through all of the transactions between the respondent and the relator a determination on the part of the former to insist upon the forfeiture as an indisputable fact.   The dues when received were entered in a suspense account to the credit of the policy, and were held by the company subject to relator's order.   This account was used in the business of respondent to provide for just such cases as the present one, where applications for reinstatements were in contemplation or were being considered.   The disposition, then, which was made of these payments, was not peculiar to this case, but followed a settled practice, manifestly adopted to serve the convenience of delinquent members seeking reinstatement, and at the same time to avoid an inference of waiver on the part of the company, which would otherwise be drawn from the unqualified receipt of the money with knowledge of the forfeiture.   Furthermore, the payment of the dues and other arrearages is one of the conditions of reinstatement; and the respondent had a right to infer, upon the receipt of the amount of the dues, that the money was transmitted pursuant to the terms of the letter of June 4th, claiming the default, but stating that a reinstatement of the member could be had on certain conditions, among which was the payment of the amount of the dues.   The only reasonable construction, it seems to me, which can be put upon this part of the transaction is that the check for the dues was forwarded to the company in harmony with the letter from the respondent, which was returned with it under the same inclosure, and was a tender of part performance of the conditions of reinstatement, which were so plainly stated in the letter referred to.   At no time did the company recede from the position it had taken at the outset in reference to the status of relator's membership.   When application was made a few days after the receipt of the dues for some change in the bene-

v.37 N.Y.S.no.5—40

ficiaries under the policy, the relator's attorney was informed of the forfeiture, and was at the same time furnished by an officer of the association with a blank form of application for reinstatement, to be filled up and signed by the relator. But it is claimed that the notice dated June 1, 1895, some three days after the forfeiture had taken place, notifying him of a mortuary call of $31.95, was such a recognition of continued membership as to be a waiver in itself of any previous forfeiture. In answer to this the respondent claims that in the ordinary course of its business about 100,000 notices are prepared and mailed bimonthly, sometimes on the 1st of such months and sometimes a few days in advance, and that the notice in question was mailed to the relator on the 31st day of May, 1895, before it was discovered that he had failed to pay his dues, which had matured two days earlier. To guard against inferences prejudicial to the company which might be drawn from such occurrences as this, it is expressly provided, in the form of call in general use by the company, and which was transmitted to the relator, that "the sending of this notice or acceptance of the above premium shall not be held to waive any forfeiture caused by nonpayment of any previous sum, when due, under said certificate or policy." The relator or his agent had this before him at the time he transmitted his check to the company for the amount of the call, and returned it to the company with his check. This check, it will be remembered, was received on the 13th day of June, 1895, and was immediately carried to the suspense account, subject to the order of the relator, who at that very time was contemplating, or the company was justified in believing him to be contemplating, an application for his reinstatement, which, if favorably acted upon, would require the payment not only of the dues, but also of this call. The relator could have obtained the amounts which he thus paid at any moment on applying to the respondent therefor. By the rules and regulations of the respondent, of which it must not be forgotten the relator was a member, money paid under the circumstances under which these dues and the call in question were paid was received by the company not as a present payment, but was carried to a suspense account, subject to the order of the member, and was to be finally credited to his policy upon reinstatement, or returned to him if reinstatement was refused. The action of the respondent, then, in regard to these payments, was entirely in accordance with its established practice in dealing with its delinquent members. It was not intended to be a waiver, nor was the receipt and retention of the money under such circumstances sufficient to constitute a waiver. While it is true, as a general proposition, that a person cannot effectively disclaim the legal consequences of his acts, yet a disclaimer of certain legal consequences may be considered for the purpose of determining the nature of the act itself, and from this point of view the statement contained in the notices transmitted to the relator, that the payments asked for should not be considered a waiver of forfeiture caused by nonpayment of any previous sum when due, is a characterization of the act which is most material upon the question of waiver when considered in connection with the manner in which the company dealt with its delinquent members.

I also fail to find any other element in the case upon which a waiver could be successfully predicated.  I do not consider that the correspondence which passed between the secretary of the company and the attorney for the relator in reference to a change of address on the policy of the relator is of any value as evidence of waiver, any more than the act of an insurance company in furnishing blanks for proofs of loss and giving instructions as to the manner of filing them is in any sense waiver of forfeiture or a bar to a defense that the policy was null and void.  Ronald v. Association, 132 N. Y. 378, 30 N. E. 739.  It is plain that the respondent association has throughout treated the relator with entire fairness and frankness.  He has nobody but himself to blame for the situation in which he is placed. He allowed his policy to lapse, although he had received nearly two months' previous notice from the company of the day on which his dues must be paid, and was cautioned that a failure to pay them on that day would result in the lapse of his policy.  Under these circumstances, the oversight on his part or on the part of his agent was inexcusable; and while one may not escape a strong feeling of sympathy with him, in view of the heavy loss which he has sustained, such feeling cannot be allowed to influence the decision of the court.  The respondent is entitled to insist upon the rigor of the contract, and, in view of the peculiar nature of the business which it is conducting, and the paramount importance of immediate payment of dues and calls, it cannot be said that its action is at all unreasonable.  It was wisely said by Judge Earl, in the case of Attorney General v. North American Life Ins. Co., 82 N. Y. 172, that (page 191):

"There are doubtless some decided cases which hold that such forfeitures should not be enforced; but I think the better rule is to uphold and enforce such contracts, when free from fraud or mistake, just as the parties have made them. The parties entering into such contracts know best the importance of their exact and literal performance."

The relator may still apply to the executive committee for reinstatement under the constitution and by-laws of the association, which, as we have seen, give them the power to reinstate a delinquent member at any time within one year for good cause shown, upon satisfactory evidence of good health, and on payment of all delinquent dues and assessments.  It is not to be presumed that the executive committee will not treat the case fairly, or fail to give him the benefit of a deliberate and impartial judgment upon such appeal.  If they should fail so to do, the law gives the relator a remedy.  He must, however, comply with the rules and regulations of the company in making such application, for it is only in the case of a delinquent member that the respondent is under any obligation to act under the provision of the constitution referred to.

The view which I have taken of the matter necessarily leads to a denial of the motion, and renders it unnecessary for me to discuss the point raised by the respondent as to the propriety of the remedy invoked by the relator.  Whether an action in equity should have been brought (Cohn v. Insurance Co., 50 N. Y. 610), or the remedy by mandamus was appropriate (People v. Musical Mutual

Protective Union, 118 N. Y. 101, 23 N. E. 129), need not, therefore, be determined.

The motion for a peremptory writ of mandamus is denied, with $10 costs.